NOTICE
Decision filed 07/15/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260158-U

NO. 5-26-0158

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* LUNA D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 24-JA-153 |
| | ) | |
| Elizabeth S., | ) | Honorable |
| | ) | Erick F. Hubbard, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE HACKETT delivered the judgment of the court.
Justices Boie and Clarke concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's findings that the respondent-mother was unfit, and that terminating her parental rights served the best interest of the minor, were not against the manifest weight of the evidence. Because no argument to the contrary would have merit, this court grants the respondent-mother's appellate counsel leave to withdraw and affirms the judgment of the circuit court.

¶ 2    The respondent, Elizabeth S. (Mother), appeals from the circuit court's orders that found her unfit to parent her minor daughter, Luna D., and that terminated her parental rights to Luna. Mother's appointed appellate counsel has concluded that this appeal does not present any issue of arguable merit and, on that basis, has filed a motion to withdraw as counsel, along with a supporting brief. See *Anders v. California*, 386 U.S. 738 (1967); *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000) (the *Anders* procedure for appellate counsel to withdraw applies to findings of parental

1

unfitness and termination of parental rights). Appellate counsel served Mother with proper notice of the *Anders* motion and a copy of the brief. This court provided her with ample opportunity to respond to counsel's *Anders* motion, but she has not responded. After examining the *Anders* motion and brief, as well as the entire record on appeal, this court concludes that the *Anders* motion is well taken. Accordingly, this court grants appellate counsel leave to withdraw and affirms the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4                    A. Neglect Petition and Shelter Care Hearing

¶ 5      This case began on August 2, 2024, when the State, pursuant to section 2-13 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-13 (West 2022)), filed a petition alleging that Luna was a neglected minor. The petition stated that Luna was born in May 2018, and therefore was six years old at the time of the petition. Mother was Luna's biological mother. Luna's legal father was Jesus D. (Father), who was an inmate in the Illinois Department of Corrections. The petition alleged that Luna was neglected under section 2-3(1)(b) of the Juvenile Court Act (*id.* § 2-3(1)(b)) in that Luna's environment was injurious to her welfare because Mother "[had] mental health issues that have led to two suicide attempts in 2024 that her children had to stop." On August 8, 2024, the State filed an amended petition, which alleged that Mother had made three suicide attempts in 2024.

¶ 6      A shelter care report was filed on August 8, 2024. The report concerned three children— Luna, Luna's half-sister Chaunte S. (born July 2007), and Luna's half-brother Krishaun S. (born February 2010). Mother was the mother of all three children, and she had custody of all three.

2

Father was the father of Luna only.[1] Chaunte and Krishaun had two different fathers. According to the shelter care report, on August 5, 2024, Krishaun found Mother in the back seat of a car. The car was locked, and the engine was not running. The heat index that day was more than 100 degrees. Krishaun called 911. Decatur firefighters broke a window and got Mother out of the car. Mother's face was red, and she was having trouble breathing. Mother screamed that she was "not supposed to live" and that "they were not supposed to find [her]." Mother was involuntarily committed to Decatur Memorial Hospital. On August 6, 2024, the Department of Children and Family Services (DCFS) took protective custody of Luna and of her two older siblings.

¶ 7       Also on August 8, 2024, the circuit court appointed a guardian *ad litem* for Luna and held a shelter care hearing. Neither Mother nor Father was present. After the hearing, the court entered a temporary custody order for Luna. The court found that removing Luna from her home was a matter of immediate and urgent necessity; that leaving Luna in her home was contrary to her health, welfare, and safety; and that reasonable efforts could not eliminate the need to remove her from the home. The court awarded temporary custody of Luna to DCFS. The court allowed Mother visitation, supervised by DCFS or its designee. The court also appointed CASA as a special advocate.

¶ 8       B. First Appearance, Adjudicatory Hearing, and Dispositional Hearing

¶ 9       On September 4, 2024, the circuit court called a first appearance in the case. Mother was present, and the court appointed counsel for her. The court admonished Mother that she needed to

---

[1]Father is not a party to this appeal. The circuit court eventually entered a default judgment against Father, finding him unfit to parent Luna and terminating his parental rights to Luna. Further, there will be no need to further discuss Luna's two older siblings, Chaunte and Krishaun, except in relation to Luna and her case. They, too, are not involved in this appeal.

cooperate with DCFS, to comply with the terms of the service plan, and to correct the conditions that required Luna to be in care or she would risk termination of her parental rights.

¶ 10     On October 2, 2024, the circuit court called the case for an adjudicatory hearing. Mother was present with counsel. Mother waived an adjudicatory hearing and stipulated to the allegations of neglect. The court admonished Mother about the need to cooperate with DCFS, to comply with the service plan, and to correct the conditions that required Luna to be in care; otherwise, she would risk termination of her parental rights. That same day, the court entered a written adjudicatory order. See 705 ILCS 405/2-21 (West 2022). The court found, by a preponderance of the evidence, that Luna was neglected, in that she was in an environment injurious to her health. See *id.* § 2-3(1)(b).

¶ 11     On November 7, 2024, Lutheran Child and Family Services (LCFS), which was assigned to provide services, submitted to the circuit court a dispositional report. According to the dispositional report, Mother had completed an integrated assessment with DCFS on October 18, 2024, but the caseworker had not received a copy of the assessment. LCFS recommended that Mother (1) cooperate with LCFS, (2) complete parenting education, (3) complete mental-health services, and (4) complete substance-abuse services. The report stated that Mother had been cooperative with LCFS and had maintained regular communication. Mother reported that she had completed inpatient mental-health treatment and was receiving outpatient treatment at Crossing Healthcare. She had been diagnosed with intermittent explosive disorder, depression, and anxiety, and she reported that she was taking mental-health medication as directed. Mother had not yet taken a random drug test. Once per week for two hours, Mother had supervised visitation with Luna and Luna's two older siblings. The visits began on October 2, 2024, at the LCFS office. However, Mother arrived one hour late for the visit on October 30, 2024, explaining that she had

overslept. She cancelled the visit for November 6, 2024, explaining that she had injured her back and had gone to the hospital. LCFS had a "guarded" expectation that Mother would be able to regain custody within the next 5 to 12 months. Although she was "engaged in services," she nevertheless "had difficulty recognizing the impact of her past behaviors on her children." Mother "[had] a history of mental health issues" but "[had] not remained consistent with treatment." The report recommended, on behalf of LCFS and DCFS, a permanency goal of return home within 12 months, and further recommended that Luna and her two older siblings be made wards of the court and placed under the guardianship administrator of DCFS.

¶ 12    On November 13, 2024, the circuit court entered a dispositional order. The court made Luna a ward of the court and placed guardianship of Luna with the guardianship administrator of DCFS. A permanency hearing was set for May 14, 2025.

¶ 13                    C. Permanency Reports, Permanency Hearings,
                and the State's Motion to Terminate Mother's Parental Rights

¶ 14    On April 23, 2025, CASA submitted a report in this case to the court. Luna and her two older siblings had been placed with their grandmother. Luna was enrolled in elementary school, and the school's staff reported that Luna was doing well. Luna was seeing a counselor and reported that she enjoyed the counseling sessions. Luna had been diagnosed with gastroesophageal reflux disease (GERD), and doctors were adjusting her diet. "[Luna] has recently adjusted to not having visits with mother [*i.e.*, Mother]. She previously was having a hard time with visits due to the ongoing no shows, cancellations, and rescheduling." Visitations were discontinued on January 9, 2025, due to a "lack of engagement" by Mother. "She would often confirm and not show, reschedule, cancel, or even come late resulting in cancellation by [CASA]." Since January 21, 2025, CASA had tried repeatedly to contact Mother, without success. As a result, there had been no contact between CASA and Mother since January 2025. Finally, CASA recommended that

5

guardianship of Luna remain with DCFS, and that Luna's permanency goal should change to guardianship.

¶ 15     Also on April 23, 2025, LCFS submitted to the court a permanency report, in advance of the permanency hearing on May 14, 2025. According to the permanency report, Mother was cooperative with LCFS until November 2024, when she stopped communicating with her caseworker. During an unannounced home visit in February 2025, Mother reported that she was not engaged in services. Mother's employment status was unknown as of the time of the permanency report. On February 27, 2025, Mother arranged for a meeting with her caseworker on March 3, 2025, but Mother failed to attend the meeting. According to the report, Mother had completed her integrated assessment on October 18, 2024, and she was recommended for substance-abuse services, mental-health services, and parenting education. In regard to substance-abuse services, Mother had not completed drug testing, and she had missed a total of 18 drug tests. In November 2024 and February 2025, Mother stated that she was not engaged in substance-abuse services. In regard to mental-health services, Mother stated at the court hearing in November 2024 that she was not engaged in mental-health services but planned to reengage. However, in February 2025, Mother stated that she had not reengaged in mental-health services. In regard to parenting education, Mother had not been referred because she had not been in communication with LCFS. Mother also had missed many of her scheduled visits with Luna and Luna's two older siblings. The permanency report also noted that Luna and her two older siblings had been placed with their maternal grandmother. The placement was said to be stable, safe, and satisfactory. "[Luna] gets along well with her grandmother and siblings, who are very protective of her." Luna was enrolled at a local elementary school, where she was doing well academically. She attended individual

mental-health counseling at Crossing Healthcare, and her anger outbursts had been decreasing. LCFS recommended a permanency goal for Luna of return home in 12 months.

¶ 16    In early October 2025, CASA submitted a report to the circuit court. CASA still had not had contact with Mother since January 2025. "The children report that [Mother] communicates sporadically, primarily reaching out to Chaunte." Chaunte informed CASA that Mother "typically contacts her only to request money." The children recalled last seeing Mother "at a gas station, accompanied by a man named Adam, with whom she is reportedly in a new relationship. During this encounter, [Mother] did not interact with the children, which caused [Luna] to become emotional." Luna had adjusted to no longer having visits with Mother. Staff at Luna's elementary school stated that Luna was doing well academically. Luna's counseling sessions had increased in frequency from monthly to biweekly. CASA had "concerns" regarding Luna not following the dietary plan prescribed by her doctors and about Luna's mental and physical health. CASA recommended that Luna's permanency goal be changed to guardianship.

¶ 17    On November 7, 2025, the State filed a motion to terminate the parental rights of Mother. The State alleged that Mother was unfit to have Luna in that she had failed (1) to maintain a reasonable degree of interest, concern, or responsibility as to Luna's welfare (see 750 ILCS 50/1(D)(b) (West 2024)); (2) to make reasonable efforts to correct the conditions that were the basis for Luna's removal from Mother during any nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) to make reasonable progress toward the return of Luna to Mother during any nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(ii)).

¶ 18                                    D. Termination Proceedings

¶ 19                                    1. *Parental Unfitness*

¶ 20    On February 2, 2026, the circuit court proceeded with the unfitness portion of the termination proceedings. The State called Amanda Turnbo as its sole witness. Turnbo testified that she was a child welfare specialist with LCFS, and in October 2025, she became the caseworker for Luna. According to Turnbo, she had tried repeatedly to contact Mother, always without success. Turnbo's telephone calls and knocks on Mother's house door went unanswered. At the start of this case, Turnbo testified, Mother was told that she needed to complete parenting classes, complete a mental-health assessment and follow any recommendations, complete a substance-abuse assessment and follow any recommendations, and comply with random drug screenings.

¶ 21    According to Turnbo, LCFS referred Mother for parenting classes when this case first opened in 2024, but Mother did not begin the classes and therefore she was discharged. Because Mother had subsequently ended all contact with LCFS, the agency had not been able to obtain the necessary consent forms from her, which precluded LCFS from making another referral for parenting classes.

¶ 22    Turnbo confirmed that Mother's mental-health problems were the reason for opening this case. Turnbo testified that Mother needed to complete a mental-health assessment and to follow any recommendations. In November 2024, Mother reported to her previous caseworker that she had completed inpatient mental-health services, and was engaged in outpatient services, at Crossing Healthcare. However, Mother later confirmed to her then-caseworker that she, in fact, had not been enrolled in mental-health services. According to Turnbo, Mother's file with LCFS did not include any verification that she had engaged in mental-health services.

¶ 23    In regard to substance-abuse services, Turnbo testified that Mother had been scheduled for 24 drug screens as of October 31, 2025, but she did not appear for any of them. Mother's file did not include any records indicating that Mother had engaged in substance-abuse services.

¶ 24    Turnbo further testified that Mother's visits with Luna started out inconsistently. Luna would become very upset when Mother failed to appear for visits. It was partially for this reason that LCFS had arranged for therapy for Luna. Mother cancelled a visit in November 2024 due to a back injury, and then missed two other visits. She had a visit on December 11, 2024, but then missed the remainder of December's visits. She did not have any visits from January through October of 2025. There were no visits currently scheduled.

¶ 25    Neither Mother's attorney nor the guardian *ad litem* called any witnesses at the unfitness hearing. They did not offer any evidence.

¶ 26    After listening to arguments, the circuit court found that the State had proven by clear and convincing evidence that Mother was unfit to have Luna under all three of the unfitness grounds alleged by the State in its termination motion. The court remarked that Turnbo's testimony was "very persuasive." The court stated that when this case began, Mother's visits with Luna were "very scattered," and there had been no visitation, at all, throughout 2025. Mother had not engaged in the recommended parenting classes or mental-health services, and she had missed all of her scheduled drug screenings. The court ordered preparation of a best-interest report and scheduled a best-interest hearing for February 23, 2026.

¶ 27                                         2. *The Child's Best Interest*

¶ 28    On February 20, 2026, LCFS filed a best-interest report. The report was submitted by child welfare specialist Turnbo and program supervisor Christin Mathias. According to the report, "[Luna] has had some difficulties since case opening but overall, [Luna] is a happy 7-year-old

9

girl." Since being taken into care, Luna had been with her maternal grandmother. Luna had "a strong bond" with her grandmother, who always had Luna's best interest in mind. The grandmother is a teacher who can be at home when Luna is there. Luna's two older siblings were also in the grandmother's home, and Luna was close to her siblings. The grandmother was willing to adopt Luna. Luna attended second grade at a local elementary school and was doing well; her favorite subjects were art and math. Luna was "on track developmentally and educationally." Luna's GERD symptoms were under control. Luna's last visit with Mother was on December 11, 2024. "Visits were attempted but [Mother] did not show." According to LCFS, it was in Luna's best interest to remain in her current placement and to be adopted by her grandmother.

¶ 29 On February 23, 2026, the circuit court conducted the best-interest portion of the termination proceedings, in order to determine whether Luna's best interest would be served by termination Mother's parental rights. Mother was not personally present, but her appointed attorney was present on her behalf. The court asked Mother's appointed counsel whether he had received "any word from [his] client," and counsel answered in the negative.

¶ 30 The State called Turnbo, of LCFS, as its sole witness. Turnbo testified that Luna was doing well. Luna had been placed with her grandmother at the start of care and had been there ever since, and the two "seem[ed] to have a really strong bond." Luna's grandmother was "really good at calming her down if she gets upset." The grandmother was committed to providing Luna with permanency. Luna was in the second grade, and seemed to "really love school," especially math. Luna's drawings and paintings were found throughout the grandmother's house. Luna's older sister and older brother also resided in the grandmother's home, and Luna was "very close" to them. At the time of the best-interest hearing, the older sister was on track to graduate from high school; she had a permanency goal of independence and could be moving out of the grandmother's

house in August. Meanwhile, the older brother might be returned to his father (a man other than Luna's father). Despite these possible changes in the household, the grandmother was committed to maintaining the relationships between Luna and her siblings. The grandmother took Luna to all her medical appointments, made sure that she took her medicine, and helped Luna with dietary choices, all in an effort to improve Luna's GERD symptoms.

¶ 31     The court took judicial notice of the best-interest report, without objection. The guardian *ad litem* recommended the termination of Mother's parental rights. The court found that the State had proven that termination of Mother's parental rights was in Luna's best interest.

¶ 32     Also on February 23, 2026, the circuit court entered a written order finding that the State had proven, by clear and convincing evidence, that Mother was an unfit parent under section 1 of the Adoption Act. The court found that she was unfit under all three grounds alleged by the State, namely: (1) she had failed to maintain a reasonable degree of interest, concern, or responsibility as to Luna's welfare; (2) she had failed to make reasonable efforts to correct the conditions that were the basis for the removal of Luna from the parent during any nine-month period following the adjudication of neglect; and (3) she had failed to make reasonable progress toward the return of Luna to the parent during any nine-month period following the adjudication of neglect. Also, the court found that it was in the best interest of Luna, and of the public, that Mother have all her residual parental rights terminated. See 705 ILCS 405/1-3(13) (West 2024) (residual parental rights are "those rights *** remaining with the parent after the transfer of legal custody or guardianship of the person"). The court terminated Mother's parental rights and responsibilities and authorized Luna's guardian to consent to Luna's adoption. A permanency order, also entered on February 23, 2026, stated that the appropriate permanency goal for Luna was adoption.

11

¶ 33    Mother's attorney promptly filed, on Mother's behalf, a notice of appeal, thus perfecting the instant appeal. The circuit court appointed counsel to represent Mother on appeal.

¶ 34                                    II. ANALYSIS

¶ 35    This appeal is from the circuit court's orders finding Mother an unfit parent and terminating her parental rights to Luna. Mother's appointed appellate counsel has filed an *Anders* motion to withdraw as counsel on the basis that this appeal is without arguable merit. Counsel accompanies his *Anders* motion with a supporting brief wherein he raises two potential issues: (1) whether the circuit court erred in finding that Mother was unfit, and (2) whether the court erred in terminating Mother's parental rights. This court will discuss each of these potential issues.

¶ 36    For a termination of parental rights, the State must first show, by clear and convincing evidence, that the parent is unfit to have a child, and then the State must then show, by a preponderance of the evidence, that terminating parental rights serves the child's best interest. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002); *In re D.T.*, 212 Ill. 2d 347, 366 (2004). The circuit court is given broad discretion and great deference in matters involving minors. *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). This court will not reverse an unfitness finding unless it is against the manifest weight of the evidence. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. Likewise, this court will not reverse a best-interest finding unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. A finding is against the manifest weight of the evidence when its opposite conclusion is plainly evident or where the finding is unreasonable, arbitrary, or not based on the evidence. *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 89.

¶ 37                              A. Finding of Unfitness

¶ 38    Appellate counsel's first potential issue is whether the circuit court erred in finding that Mother was unfit. The Adoption Act provides several grounds on which a circuit court may find

12

that a parent is unfit to have a child. See 750 ILCS 50/1(D) (West 2024). "A parent's rights may be terminated if a single alleged ground for unfitness is supported by clear and convincing evidence." *In re D.C.*, 209 Ill. 2d 287, 296 (2004).

¶ 39     Here, the circuit court found Mother an unfit parent on three different grounds. Because each of the statutory grounds of unfitness is independent, the circuit court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002). The circuit court found that Mother had failed to make reasonable efforts to correct the conditions that were the basis for the removal of Luna during any nine-month period following the adjudication of neglect. See 750 ILCS 50/1(D)(m)(i) (West 2024). Additionally, the circuit court found that Mother had failed to make reasonable progress toward the return of Luna during any nine-month period following the adjudication of neglect. See *id.* § 1(D)(m)(ii). Since the evidence supporting these findings is the same, we will address both, though either finding would be sufficient to affirm the circuit court's order.

¶ 40     In analyzing the reasonableness of a parent's efforts to correct the conditions that were the basis for the removal of the minor, the circuit court uses a subjective assessment based upon the amount of effort that is reasonable for the particular parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066-67 (2006). In assessing a parent's reasonable progress, the circuit court uses an objective standard. *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). The question is whether the parent's progress in complying with directives given for the minor's return demonstrates that, in the near future, the court will be able to order the minor returned to parental custody. *Id.*

¶ 41     Here, the circuit court entered its adjudication of neglect on October 2, 2024. At the unfitness hearing on February 2, 2026, the evidence was clear and uncontradicted that Mother had not completed—or even begun—the recommended parenting classes, the recommended mental-

13

health assessment and services, or the recommended drug-abuse assessment and services, including drug screens. Such abject failures established that Mother, during any nine-month period since the adjudication of neglect, had failed (1) to make reasonable efforts to correct the conditions that were the basis for Luna's removal and (2) to make reasonable progress toward Luna's return. These two findings by the court were not against the manifest weight of the evidence, and no meritorious argument to the contrary can be made. Each of these two findings served as a separate and independent ground for Mother's parental unfitness. See *In re C.W.*, 199 Ill. 2d at 217 ("the grounds set forth in section 1(D) [of the Adoption Act] each provide a discrete basis for a finding of unfitness"). We need not address the third ground alleged as the circuit court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *Id.*

¶ 42                                    B. Best-Interest Finding

¶ 43    Appellate counsel's second potential issue is whether the circuit court erred in terminating Mother's parental rights. The termination of parental rights is an extreme act. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 52. Nevertheless, after a circuit court has determined that a parent is unfit, parental rights must yield to the best interest of the child. *Id.* After the finding of unfitness, the State bears the burden of proving by a preponderance of the evidence that the termination of parental rights is in the child's best interest. 705 ILCS 405/2-29(2) (West 2024).

¶ 44    Here, the court found, based on its considerations of the relevant statutory best-interest factors (see *id.* § 1-3(4.05)), that Luna's best interest required terminating Mother's parental rights. The court relied on LCFS's best-interest report and on the uncontested testimony of the LCFS caseworker at the best-interest hearing, which was held on February 23, 2026.

¶ 45 The evidence showed that Luna was doing well at her placement with her maternal grandmother. Luna had been with her grandmother since being taken into care in August 2024, and they had developed a strong bond. The grandmother always had Luna's best interest in mind. She took Luna to all her doctors' appointments, and seemed to have Luna's GERD symptoms under control. Luna was also close to her older sister and her older brother, who also resided in the grandmother's house. The grandmother was committed to maintaining the relationships between Luna and her siblings. Luna loved school, especially art and math. Luna's drawings and paintings were found throughout the grandmother's house. The grandmother was committed to providing Luna with permanency, and she was willing to adopt her. Meanwhile, Mother had not had a visit with Luna since December 11, 2024, despite LCFS's efforts.

¶ 46 In short, the evidence was abundant that the grandmother provided Luna with a safe, secure, and loving home, with connections to siblings and the community. By way of contrast, Mother had shown no interest in Luna for well over a year. The circuit court's finding that termination of Mother's parental rights served the best interest of Luna was not against the manifest weight of the evidence, and any argument to the contrary would have no merit.

¶ 47                                    III. CONCLUSION

¶ 48 This appeal presents no issue of arguable merit. Accordingly, this court grants appellate counsel leave to withdraw. This court affirms the circuit court's unfitness finding of February 2, 2026, and the order terminating Mother's parental rights entered on February 23, 2026.


¶ 49 Motion granted; judgment affirmed.